UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| NINA CASSIDY TATE, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | CAUSE NO. 1:12-cv-1188-WTL-DKL |
| ORTHOPAEDICS-INDIANAPOLIS, P.C., | ) ) ) | |
| Defendant. | ) | |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendant Orthopaedics-Indianapolis, P.C.'s, motion for summary judgment (dkt. no. 37). The motion is fully briefed,[1] and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motion for the reasons, and to the extent, set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue

---

[1] The Plaintiff filed a motion for leave to file a surreply in opposition to Defendant's motion for summary judgment (dkt. no. 57). This motion is also fully briefed, and the Court, being duly advised, **GRANTS** the motion. The Clerk is **DIRECTED** to file the surreply (dkt. no. 57-1) and accompanying exhibits.

may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The facts that follow are those taken in the light most favorable to the Plaintiff, Nina Cassidy Tate. Additional relevant facts are included in the Discussion section below.

Orthopaedics-Indianapolis, P.C. ("OrthoIndy") is a full-service orthopaedic practice with several locations in central Indiana. Tate began working for OrthoIndy on June 17, 1991, as an administrative assistant. She worked in a variety of positions while at OrthoIndy including as a patient litigation specialist from 1997 until July 2009.

From 2007 through October 2008, Tate was supervised by Lil Koopman, vice president of clinical services. She had a great working relationship with Koopman and believed Koopman was a good supervisor. In October 2008, however, Linda Reddington, corporate counsel for OrthoIndy, became Tate's new supervisor. While the two had an amicable working relationship at the start, their relationship quickly deteriorated, and by early 2009, Reddington began to identify several issues with Tate's job performance.

Concerned about Reddington's comments regarding her job performance and conduct towards her, in April 2009, Tate went to Koopman for advice but received no response. She subsequently met with Koopman in June 2009 to discuss what she believed to be continued discriminatory and harassing behavior. These concerns were relayed to then-CEO of OrthoIndy John Martin; however, no further action was taken.

On July 27, 2009, Reddington gave Tate her first negative annual performance review in her tenure as an OrthoIndy employee. In the review, Reddington criticized Tate for lacking attention to detail, making various clerical errors, and failing to be proactive in her job responsibilities. Reddington also noted that Tate had been accustomed to working with little supervision and was struggling working in a team environment. This performance review was given shortly after Reddington promoted Tiffani White, a significantly younger employee, to a position supervising Tate, despite her lack of experience with OrthoIndy and other hospitals. Notwithstanding Tate's qualifications and experience at OrthoIndy, Reddington did not consider Tate for this position because she said Tate was "old school."

Tate subsequently filed a charge of age discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on August 4, 2009. Within a month, however, Tate reached an agreement with OrthoIndy. A settlement agreement was entered into on September 3, 2009, whereby OrthoIndy agreed to transfer Tate to an administrative assistant position where she would be supervised, once again, by Koopman if Tate agreed to dismiss her pending EEOC charge. Thus, per the agreement, Tate was given a fresh start in her new job at OrthoIndy and began working in her new position in early September 2009.

Two weeks later, however, her job changed, and Tate began splitting her administrative assistant duties between Koopman and Amanda Gleason, who worked in the Human Resources ("HR") department. Soon after Tate began working for her, Gleason began collecting feedback on Tate. On September 24, 2009, Gleason placed an Employee Feedback Form in her personnel file, criticizing her for inappropriate use of company email. This was Tate's "first warning." Gleason also began an informal 60-day evaluation of Tate, soliciting feedback from Tate's co-workers including Alicia Hoover, Amy Urbanski, and Becky Miller. This feedback, however,

was never provided to Tate, even though other employees in the HR department were provided with their feedback and given the chance to review and sign the form. On December 30, 2009, Gleason ordered a review of Tate's phone calls, resulting in a "second warning" on April 1, 2010, for an abnormal number of personal calls received to her business phone. Again, this warning was never given to Tate.

Tate continued to work in her dual position, and was never given any formal indication that her performance was deficient. Nevertheless, Koopman and Gleason felt that Tate performed poorly for the entirety of 2010, resulting in Tate receiving a subpar annual performance evaluation in December 2010. The review indicated that Tate was unable to complete her duties without assistance, her work had to be double checked by co-workers, errors were still being made, and she was not fully engaged in her work. Koopman and Gleason thus put Tate on a Performance Improvement Plan ("PIP"). The PIP identified several problem areas, goals, and objectives, as well as additional training that Tate needed to complete. The PIP indicated that Tate needed to meet with her supervisors on a regular basis to evaluate her progress; however, these meetings took place only sporadically.

Gleason and Koopman issued Tate another Employee Discipline Report on February 25, 2011, her "third warning," placing her on a 30-day probationary period. The February report indicated that Tate was still making filing errors, needed to reduce her turnaround time regarding reference checks for potential employees, had not mastered the badge-making system, still needed to receive directions regarding how to complete tasks, and lacked advanced computer skills. During this meeting, Gleason and Koopman expressed to Tate that "this job may not be a good match for her skills and interests" and decided to investigate "what other opportunities might be available within the company."

At the end of the thirty-day probationary period, Gleason and Koopman decided to restructure Tate's position to be more suited to her strengths—they did "not feel that Nina's skills sets [were] suited to multitasking, complex reporting and computer skills, and project management." She was thus transferred to HR full-time, and her duties in the administrative department under Koopman were eliminated. This change in job duties served as Tate's "fourth warning." Gleason, however, continued to see problems with Tate's performance and placed an Employee Feedback Form, serving as Tate's "fifth warning," in her personnel file in July 2011. The form indicated that Tate needed to decrease her turnaround time with regard to phone screens and noted her struggles with the badge system.

Tate's final warning was given on October 27, 2011, noting that Gleason "continued to have performance concerns" with Tate. She was given another Employee Discipline Report and told she would be given two weeks to improve, at which point a decision would be made about her continued employment. On November 10, 2011, a decision was made to terminate Tate's employment, and she was fired on November 14, 2011, at the age of sixty-four.

Tate filed a charge of discrimination with the EEOC claiming age discrimination and retaliation on November 16, 2011. She received a right to sue letter and filed her complaint in this Court on August 21, 2012.

### III. DISCUSSION

Tate brings three claims in her complaint: 1) a discrimination claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; 2) a retaliation claim pursuant to the ADEA, in violation of 29 U.S.C. § 623(d); and 3) a breach of contract claim. OrthoIndy moves for summary judgment on all counts. Its arguments will be addressed, in turn, below.

5

## A. Age Discrimination

Tate alleges that she was terminated because of her age in violation of the ADEA. Under the ADEA, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensations, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To survive a motion for summary judgment on an ADEA discharge claim, a plaintiff must present evidence of intentional discrimination through either the direct or indirect method. *See Oest v. Ill. Dep't. of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012). As explained more fully below, the Court believes that Tate has proffered sufficient evidence to satisfy her burden under the indirect method.[2]

To avoid summary judgment under the indirect method, a plaintiff must offer evidence that 1) she belongs to a protected class;[3] 2) her performance met her employer's legitimate expectations; 3) she suffered an adverse employment action;[4] and 4) a similarly situated employee not in her protected class received more favorable treatment. *Brummett v. Sinclair*

---

[2] While Tate also alleges she can survive summary judgment under the direct method, the Court need not examine that method having found she satisfied her burden under the indirect method.

[3] It is undisputed that Tate belonged to a protected class at the time OrthoIndy terminated her employment.

[4] In her complaint, Tate alleges that "OrthoIndy's demotion and termination of Ms. Tate's employment were adverse employment actions taken against Ms. Tate because of her age." Complaint at ¶ 77. She further alleges in her deposition that her transfer to the HR department on a full-time basis in April 2011 was also a demotion. *See* Tate Dep. at 240-41. In response, OrthoIndy argues: 1) that these are not adverse employment actions because "Tate's rate of pay, job duties, and job title remained substantially the same before and after each transfer"; and 2) that they are time barred. *See* OrthoIndy Brief at 16-17.

The Court agrees with OrthoIndy that these "demotions" are not adverse employment actions. In the Court's view, these are more properly classified as actions taken by OrthoIndy that led to Tate's ultimate adverse employment action: her termination. In other words, these actions are evidence of Tate's alleged-theory that OrthoIndy "set her up to fail" so they could ultimately terminate her. Accordingly, the Court will only consider her termination as an adverse employment action for the purpose of this motion.

6

*Broad. Grp. Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). Once the plaintiff has established her prima facie case, the burden shifts to the employer to present a legitimate and non-discriminatory reason for the employment action. *Id.* On such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Id.*

### 1. *Legitimate Expectations/Pretext*

OrthoIndy first argues that Tate cannot meet her prima facie case because she was not meeting its legitimate job expectations. Tate's arguments in response are really two-fold. First, she argues that she was meeting OrthoIndy's expectations—in other words, the "negative comments about [her] were often unfounded, and criticism was often misdirected." Pl.'s Response at 13. And second, when she does admit that she made mistakes, she argues that it was not her fault because she was not properly trained and she was provided with incorrect and/or incomplete instructions. In other words, she argues that OrthoIndy's expectations of her were not *legitimate*—she claims they were "illegitimate and unreasonable." *Id*. at 11. In arguing this way, this prong of her prima facie case really merges with that of pretext. *See Peirick v. Indiana Univ.- Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687-88 (7th Cir. 2007) ("Where, as here, an employee claims that she 'performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same – whether the employer is lying.'" (quoting *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006)). The Court will thus address them together.

The Court believes that Tate has submitted sufficient evidence to create a genuine issue of fact as to whether she was meeting OrthoIndy's legitimate expectations. For instance, Tate received her "final warning" from OrthoIndy on October 27, 2011; however, Tate has submitted

7

evidence suggesting that many of the "performance concerns" noted on that form were misconstrued. For example, Tate was criticized for her low number of phone screens—Gleason reported that she should have been completing six to ten phone screens per day. *See* dkt. no. 47-26. However, Tate herself stated that each phone screen took at least twenty-five to thirty-five minutes to complete. *See* Tate Dep. at 216. Completing six to ten per day could take up to approximately six hours, without taking breaks or completing any other assignments. *Id.* Given the number of other items Tate was assigned to complete in the HR department, a jury could conclude that this expectation was not legitimate.

With respect to her performance on the badge system, she was criticized for not giving an employee access to a specific building; however, she specifically stated that she was not trained on how to perform that task. *See id.* at 218 (noting that Alicia stated "Oh, I forgot to show you that[.]"). She was also criticized for her handling of an employee's request for a new badge. Even though she strictly followed the policy—to charge that employee a fee to create a new badge—Gleason criticized her, noting that she could have used her "discretion" to waive the fee. *See* Gleason Dep. at 92. In other words, Tate's performance was criticized despite the fact that she was never trained to perform one task and strictly followed the policy with respect to the other. These are factual disputes with respect to whether or not Tate was meeting OrthIndy's legitimate expectations that preclude a grant of summary judgment.

Finally, with respect to her filing mistakes, the Court gleans that the filing was a very complex task, as Tate's coworkers noted. *See* dkt. no. 47-19 (noting the filing system is "not just simple"); *see also* Urbanski Dep. at 35 ("[T]he filing is very tasky, it's very task oriented[.]"). It is likely that some of Tate's mistakes were certainly due to her error, and her error alone. However, Tate has submitted evidence alleging that she was never fully trained and was given

8

incorrect and/or incomplete guidance on the filing and tabbing system. *See, e.g.*, dkt. no. 47-15 ("I [Gleason] think I have taken too much of a back seat to her training . . . I think that [Tate's difficulties in initiating into the HR department] is partly due to my staff being resistant."). Further, the filing instructions are riddled with cross-outs and additional information Tate herself added. *See* Gleason Dep. at 130 ("So she's crossing out the written policy guide and saying she's been told to do something different than the written policy guide[.]"); *see also* Tate Dep. at 249 ("I was given one sheet of paper, very simplified, about training. I was to use that guide that was old. It was dated—2006 was the last revised date. I was reprimanded for using that. I had to find out little by little, piece by piece[.]"). It appears that the filing instructions were ever-changing—making what was already a difficult task nearly impossible to perform correctly. Tate was held to a 99% accuracy standard—something no other employee had to meet because Gleason stated that no other employee was individually audited for her filing. *See* Gleason Dep. at 136. A jury could question the legitimacy of OrthoIndy's filing expectations for Tate given that no other employee was held to this same expectation or was individually scrutinized for her work.

The above scenarios are just a snapshot of what Tate alleges was OrthoIndy's plan to set her up to fail by providing "incorrect instructions, inadequate and inconsistent training, and assumptions that any perceived mistake was the fault of Tate." Tate Response at 1. The Court believes that Tate has created a genuine issue of fact as to whether the expectations of OrthoIndy were legitimate and whether she was meeting them. Accordingly, she has satisfied this prong of the indirect method.

As the Court noted, the above analysis overlaps significantly with that of pretext. "To demonstrate a material issue of fact as to pretext, [Tate] must show that "either 1) it is more

9

likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible." *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)). OrthoIndy has offered the following two reasons for terminating Tate: 1) "her continued inability to meet its legitimate performance expectations"; and 2) "the need to restructure the position to get more productivity out of the position." OrthoIndy Brief at 20. The Court believes that a reasonable jury could find that the evidence viewed in the light most favorable to Tate supports a finding that she was meeting their legitimate expectations.

With regard to OrthoIndy's restructuring of Tate's position, Koopman and Gleason thought that a full-time HR position was "more suited to Nina's strengths." Dkt. No. 30. This is despite the fact that both Gleason and Koopman noted Tate's struggles with the HR tasks. Specifically, Gleason had been documenting Tate's struggles essentially from the moment Tate began working under her. A reasonable jury, therefore, may question if moving Tate to a full-time HR position would really, in fact, be beneficial to her. This, coupled with the other issues Tate has noted above, lends support to her theory that OrthoIndy "set [her] up to fail" by placing her in a position for which she was unqualified. *See* dkt. no. 47-1 (noting that Hoover felt Tate was not qualified for the HR position); *see also* dkt. no. 48-69 (noting that Urbanski did not believe it was a good decision to move Tate into HR).

This is further compounded by Tate's allegation that she did not receive consistent feedback on her work. For instance, Gleason solicited comments from Urbanksi, Hoover, and Miller regarding Tate's 60-day evaluation; however, none of this information was then relayed to Tate, while—as shown by Exhibits 20 through 23—Urbanski and Hoover signed and reviewed their thirty, sixty, and ninety-day informal evaluations. Tate did not receive the same treatment.

She produced numerous emails, notes, and forms evidencing the "secret feedback" that OrthoIndy failed to give to her. *See* dkt. no. 48-72. In all, the Court believes that Tate has alleged sufficient facts such that a jury could conclude that OrthoIndy's explanations for terminating her employment were not credible.

### 2. *Similarly Situated, Younger Comparator*

OrthoIndy also argues that Tate cannot identify a similarly situated, younger employee who was treated more favorably than she was. "The 'similarly situated' test is a flexible, commonsense inquiry whose requirements vary from case to case." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). "This generally requires the plaintiff to show that the comparator had the same supervisor, was subject to the same employment standards, and had engaged in conduct similar to that of the plaintiff." *Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011).

Tate identifies three similarly situated, younger employees who received more favorable treatment than she did: Alicia Hoover, Amy Urbanski, and Becky Miller.[5] All worked in the HR department at the same time Tate did, all were supervised by Gleason, and all performed similar tasks to Tate including filing, making badges, and performing recruiting tasks. Tate has produced evidence that each of these employees made mistakes similar to those that she made but, unlike her were never formally reprimanded. Further, she alleges that these employees received one-on-one, full-time training on how to perform various HR tasks, whereas she did not.

OrthoIndy's main argument in response is that these individuals are not similarly situated because "Tate's performance was far below that of other department employees." OrthoIndy

---

[5] At the time Tate was working in HR, Hoover was twenty-three years old, Urbanski was twenty-two years old, and Miller was at least thirty years younger than Tate.

Reply at 9. The Court has noted above that Tate has alleged sufficient facts such that a jury could conclude otherwise. Whether or not Tate performed worse than the similarly-situated employees she has identified is thus a question of fact that must be left for the jury to decide. *Cf. Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001) ("Although United [Airlines] suggests that the other [probationary flight attendant's] conduct was far less intentional, that conclusion is dependent upon the trier of fact's interpretation of Mr. Gordon's encounter with Velasco. As we already have noted, this encounter is open to different interpretations."). Drawing all reasonable inferences in Tate's favor, the Court finds that Tate "has demonstrated that there is a genuine issue of triable fact as to whether similarly situated employees outside the protected class were treated differently." *Id*.

Having found that Tate has satisfied her burden under the indirect method, the Court must **DENY** OrthoIndy's motion for summary judgment as to Tate's age discrimination claim.

### B. Retaliation

Tate also contends that OrthoIndy terminated her in November 2011 in retaliation for filing her EEOC charge in August 2009.[6] Title VII prohibits retaliation by an employer where an employee "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). Like discrimination claims, a plaintiff may establish a prima facie case of retaliation under the direct or indirect method. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Under either method, the plaintiff must present

---

[6] In her Complaint, Tate also alleges that she was terminated in retaliation for sending an email to OrthoIndy on November 11, 2011, making an internal complaint of age discrimination. Tate, however, does not argue this in her Response, as it seems she discovered during discovery that OrthoIndy decided to terminate her prior to her email being sent. Accordingly, the Court will only address whether she was terminated from her position at OrthoIndy in retaliation for filing the EEOC charge in August 2009.

12

evidence that she engaged in a statutorily protected activity and she suffered a materially adverse action. *Id.* Under the direct method, she completes her prima facie case with evidence of a causal connection between her protected activity and the adverse action. *Id.*

In this case, it is undisputed that Tate engaged in statutorily protected activity—filing an EEOC charge in August 2009 claiming age discrimination—and that she suffered a material adverse action by her employer—she was terminated. However, OrthoIndy argues that Tate cannot meet her burden of proving the other element to satisfy her prima facie case. The Court disagrees, and for the reasons explained below, finds that Tate has satisfied her burden under the direct method.

As stated above, Tate completes her prima facie case by offering proof of a causal connection between her filing the EEOC charge and her termination. She claims she has produced "a convincing mosaic of circumstantial evidence" that shows OrthoIndy "was motivated to terminate [her] because of [her] protected activity." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 307 (7th Cir. 2012). The Court agrees with Tate that a reasonable jury could infer from "the cumulative effect of [her] bits and pieces of evidence" that OrthoIndy terminated her employment because she filed her EEOC charge, claiming age discrimination. *Id.* at 647.

While OrthoIndy is correct that two years passed between Tate filing her first EEOC charge and her ultimate termination, Tate alleges that "the ball started rolling" to terminate her immediately after she entered into the settlement agreement with OrthoIndy. Pursuant to that agreement, Tate was to be working under Koopman, a prior supervisor with whom she had a good working relationship; however, two weeks later she was informed that her position changed and she would also be working in HR under Gleason. Having Tate work in this dual position is something even Gleason herself noted might have been "unrealistic." Gleason Dep. at 46.

13

Once she was transferred, Gleason immediately began collecting feedback on Tate's performance, Tate's internet usage, and Tate's phone calls—placing "warnings" in her file, sometimes without even addressing the concerns with Tate. A reasonable jury may question why Gleason would not share this performance feedback with Tate; if she truly was struggling, the only way for her to improve would have been to inform her of what she was doing incorrectly. This is compounded by the fact that Tate's co-workers received certain pieces of feedback, including thirty, sixty, and ninety-day reviews that Tate did not.

Again, viewing the facts in the light most favorable to Tate, a reasonable jury could also infer that her full-time transfer to HR was all part of OrthoIndy's plan to "set Tate up to fail." As the Court noted above, despite Tate's allegedly constant struggles in the HR department, she was transferred to HR full-time in March 2011 by Gleason and Koopman. Tate's coworkers disagreed with this decision. Hoover stated, "I didn't feel she [Tate] was qualified for the HR Assistant position. She didn't bring the necessary skill set to do well, and I feel as though she was set up to fail." Dkt. No. 47-1. Urbanski also agreed that it was not a "sound decision" to move Nina to the HR department. *See* dkt. no. 48-69. While OrthoIndy claims it "makes no sense" that "these individuals [would] take the time to hatch a drawn-out, secret plan to sabotage Tate because of her age or her prior charge," it is precisely from this mosaic of circumstantial evidence that a jury could infer just that. OrthoIndy Reply at 2. "Interpreting the facts in [Tate's] favor, she can show a pattern of criticism and animosity by her supervisors following her protected activities. A pattern like that presented here supports the existence of a causal link." *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1014 (7th Cir. 1997). As the Court noted above, viewing the facts in the light most favorable to Tate, a reasonable jury could find a causal link between Tate's termination and her EEOC complaint

Accordingly, OrhtoIndy's motion for summary judgment with respect to Tate's retaliation claim is **DENIED**.

### C. Breach of Contract

Finally, Tate argues that OrthoIndy breached its settlement agreement with Tate for the following reasons: 1) failing to provide her with adequate and proper training; 2) failing to provide additional clarification and/or guidance as requested; 3) failing to approve her requests to attend computer classes; 4) retaliating against her by changing her job two weeks after she entered into the settlement agreement; and 5) continuing to discriminate against her on the basis of age and retaliate against her for filing her EEOC charge. *See* Tate's Complaint at ¶ 99. "The elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Murat Temple Ass'n, Inc. v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125, 1128-29 (Ind. Ct. App. 2011). The issue at the summary judgment phase is whether OrthoIndy breached any of these contractual provisions, as the parties do not dispute the existence of the contract or Tate's damages.

The settlement agreement provided that Tate would dismiss her pending EEOC charge in exchange for a transfer to an administrative assistant position under Koopman. *See* dkt. no. 39-10 at 1-2. OrthoIndy promised that her compensation and benefits would not change in this new position and agreed to provide her computer training, in its discretion, so she could effectively perform her new job. *Id*. at 2. In the settlement agreement, OrthoIndy also acknowledged "its legal obligation not to unlawfully retaliate against" Tate. *Id*. at 6.

Turning now to Tate's allegations, her claim that OrthoIndy breached the settlement agreement by retaliating and discriminating against her is based on the following provision in the settlement agreement: "OrthoIndy acknowledges its legal obligation not to unlawfully retaliate

against [Tate] because she filed the Complaint." *Id*. The Court agrees with OrthoIndy that this provision cannot support her breach of contract claim. As OrthoIndy correctly notes, this "is simply an affirmation of OrthoIndy's duty not to unlawfully retaliate under the ADEA. This contractual obligation is coextensive with, and no greater than, OrthoIndy's statutory obligation not to unlawfully retaliate under the ADEA." OrthoIndy Brief at 27. If a jury finds that OrthoIndy retaliated and/or discriminated against Tate, this would also mean that OrthoIndy breached the settlement agreement—Tate's claim that OrthoIndy breached the agreement by retaliating and discriminating against her is thus completely encompassed by her claims under the ADEA, and she cannot recover for both.

With regard to Tate's insufficient training claim, OrthoIndy argues that it did not breach the settlement agreement by failing to train her because the agreement provided that training would be provided "in its [OrthoIndy's] sole discretion." Tate argues that this discretion was not exercised in good faith, citing a Northern District of Illinois case that applied Michigan law to an employment contract. *See Hanley v. Trendway Corp.*, 953 F. Supp. 232, 236 (N.D. Ill. 1996). In this case, however, the contract at issue is not an employment contract, it is a settlement agreement, and Indiana law applies, not Michigan law. "In Indiana . . . implied covenants of good faith and fair dealing apply only to insurance and employment contracts or where contracts are ambiguous as to the application of the covenants or expressly impose them." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011) (citing *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008)).

As noted above, this settlement agreement is not an employment contract; it is also not an insurance contract. Further, the Court does not find OrthoIndy's promise to "in its sole discretion, provide [Tate] with training reasonably necessary on use of computer software

programs required for her to perform the duties and responsibilities of the Administrative Assistant position," dkt. no. 39-10 at 2, to be ambiguous. And finally, Tate has not directed the Court to any provision that expressly imposed a good faith requirement on OrthoIndy with regard to this provision. Accordingly, Tate's good faith argument fails as a matter of law. Summary judgment is therefore **GRANTED** in favor of OrthoIndy on Tate's breach of contract claim.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, OrthoIndy's motion for summary judgment (dkt. no. 37) is **DENIED** with respect to Tate's ADEA claims and **GRANTED** with respect to her breach of contract claim.

SO ORDERED: 03/19/2014

_____
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication